MABEL C. KELLY, petitioner,

*a*

FRANK KELLY, defendant.

[Decided February 5th, 1925.]

**Divorce—Desertion—Uncontested—Exceptions to Master's Report of Insufficiency of Evidence—Conflict in Petitioner's Testimony, Leaving Doubt Regarding Motive for the Leaving—Adverse Report Sustained.**

On exceptions to master's report.

*Mr. Marshall Miller,* for the exceptant.

BUCHANAN, V. C.

Petitioner's suit is for divorce on the ground of desertion, and was not defended by the husband. The master reports adversely to the granting of the decree, stating that it is not sufficiently proven that the desertion or separation was obstinate. To this the petitioner excepts.

The evidence is ample that the husband left the matrimonial domicile in January, 1921, and did not return, though the wife kept up the home there for six months thereafter. There is no testimony but the wife's, however, as to the actual cause or reason for his leaving, or the circumstances immediately preceding and attending that occurrence.

She testified twice before the master—in March, 1924, and again in June, 1924. On the first occasion she said that the reason the husband left was because she insisted on his going to the doctor to prove that he was not afflicted with venereal disease. She testified to circumstances indicating that he was infected venereally, and that she suspected it, and accused him of it, and he neither admitted or denied it; that she finally told him that if he wouldn't go to the doctor with her she would know it was true and wouldn't live with him,

whereupon he got angry and said, "No, damn you, I'll get out," and left her (how soon thereafter does not appear).

The only attempt at corroboration of this is the statement by petitioner's brother that defendant told him, about two weeks before the leaving, that he had a venereal disease.

On the occasion of her second deposition before the master she said: "The reason he left me was, I think, because he got to going out with other women, and I could notice the change in him toward me;" and she further said "the night before my husband left me it was raining and he was going to leave me then. I coaxed him not to go and he stayed until morning," and that in the morning he packed up, took his clothes, said he was going to leave her, and did leave her.

There is on the face of these two depositions some inconsistency, which, however, on consideration, might be deemed more apparent than real. We may assume that the two are susceptible of satisfactory reconciliation, and it may further be assumed for the sake of argument, that, except for the further discrepancy in her testimony, hereinafter referred to, there might be found sufficient corroboration of her testimony, generally, to render it unnecessary that there be specific corroboration of her testimony on this particular point.

It further appears, however, that according to her testimony she met her husband about three times after he left her, these meetings being within three months thereafter, and on the streets of Easton, Pennsylvania. In March, 1924, she testified that on these occasions her husband stopped her on the street and asked her if she was going to take him back and she replied that she would when he proved to her he was cured. When she testified in June, 1924, she said her husband tried to avoid her on the occasions of these meetings; that she crossed the street to make him talk to her; that she asked him when he was coming back, and that on the last occasion (in April, 1924) he replied that he was never coming back, "that he liked that life better and would not live with me."

The discrepancy, indeed the actual contradiction between these two stories, is obvious and serious. It might very well

be that either story, alone (if believed by the court to be true, and adequately corroborated), would be sufficient to entitle petitioner to a decree. But it is impossible, of course, that both stories by the wife can be true; nor is it possible to believe that both stories could have been told by the wife in complete good faith. No trick played by her memory could account for her saying at one time that he had sought the street interviews, and at another time she had sought them while he had tried to avoid them.

The result is that confidence in her testimony is destroyed; doubt is at once cast upon her story of the inception of the separation and of her efforts or desire to have her husband return. Proof of the obstinacy of the alleged desertion therefore must be sought in other evidence; and there is no such sufficient evidence in the case.

Some slight evidence that the separation was against the wife's will may be spelled out of the mother's testimony that the wife was downhearted and crying the day after the husband left, and that the wife kept up the home for six months, but, after all, neither of these facts is any real proof that the wife did not cause, or participate in, or consent to the husband's leaving, or in the continuance of the separation. Neither of the two facts is incompatible with the possibility, for instance, that the husband's leaving might have been caused by a quarrel over some unreasonable demand or action on her part, that she told him to get out, and, though afterwards sorry for the resultant situation, was yet unwilling to ask or permit him to return unless he yielded to her.

The testimony of the witnesses Susan Styer and Jeremiah Halley at best tend to prove only that the desertion was willful on the part of the husband, not that it was obstinate, against the wife's will or consent.

The master correctly found that there was insufficient proof that the alleged desertion was obstinate, and the exceptions must be overruled.